## Clark v. Robinson.

(Decided May 14, 1914.)

### Appeal from Carter Circuit Court.

1. Elections—Contest—Amendment Setting Up Additional Names of Illegal Voters.—Under the provisions of subsection 12 of Section 1596a, Kentucky Statutes, the ruling of the trial court in refusing an amendment to the petition setting out additional names of illegal voters was proper, it being in effect to plead additional grounds of contest.

2. Elections—Contest—Removal of Ballot Boxes to Office of Master Commissioner.—Under Section 1596a, Kentucky Statutes, the circuit court had the power to transfer the custody of the ballot boxes from the county clerk's office to the office of the master commissioner.

3. Elections—Contest—Amendment Perfecting Grounds of Contest. —An amendment that merely undertakes to perfect and make more definite grounds set out in the original petition is permissible under Section 134 of the Civil Code. Such an amendment does not bring in the names of other voters, or charge additional irregularities.

4. Elections—Contest—Evidence.—In a contest for the office of Superintendent of Schools, evidence examined and held sufficient to show that the contestant was fairly elected and entitled to qualify, and the certificate awarded the contestee was properly cancelled.

G. W. E. WOLFORD for appellant.

THEOBALD & THEOBALD, J. G. MORRIS and W. C. KOZEE for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

Clark, as Republican, and Robinson, as Democrat, were the nominees and candidates of the two dominant parties in Carter County at the last election for the office of superintendent of common schools. Mrs. Shay was the candidate of the Progressive party. The election commissioners canvassed the returns from the several precincts of the county, and there were nineteen of them, and it showed that Clark had, on the face of the returns, a plurality of eighteen votes over Robinson. Thereupon the commissioners issued and awarded to Clark a certificate of election. Within the statutory period Robinson filed his petition in the circuit court contesting the election. The petition set out with detail the names of many persons in each precinct who were permitted to vote although not entitled to. The grounds of illegality in each case were specifically set forth. They consisted of non-residency, non-age, open voting, and disclosure of the ballot after voting, and others laboring under conviction for felony. The charge also went to each precinct in the county of fraud and mistake on the part of the election officers in receiving, tabulating, counting and certifying the vote cast, with the claim that if the ballots were recounted it would show that Robinson was elected, and had a majority of the votes cast.

The greatest number of illegal votes cast and the most serious irregularities charged against the officers have reference to precinct number fifteen, known as Brick-yard. It is claimed that here there was such fraud and corruption as to render the election void in that precinct. About 175 illegal anl fraudulent votes are specified as having been cast for Clark in the whole county. As soon as the petition was filed, and according to its prayer, the circuit judge entered an order directing the county clerk to surrender possession to the master commissioner of all the ballot boxes. Clark traversed every material allegation, and also made counter charges of a similar nature, affecting about an equal number of votes throughout the county. The issues were made up and the proof taken. On cross-examination of Clark's witnesses, Robinson discovered the names of 49 other people who had voted for Clark and against Robinson, either in an illegal way, or without any right at all to vote. Robinson tendered an amendment setting up in detail these additional illegal votes. When the case came for trial Clark moved the court to vacate the bench, supporting his motion with an affidavit. This motion prevailed, and another regular judge of a distant district was sent by the Governor, as provided by law, to try the case. The first ruling of the court was to refuse permission to Robinson to file the amendment setting up the forty-nine additional names of illegal votes and voters. This ruling of the court was proper, because the amendment could not in any sense be considered as an attempt to more accurately set forth or to perfect the original grounds relied upon. It was essentially an effort to plead additional grounds of contest. It is true it was merely adding to the list of illegal voters and votes relied upon in the first instance as grounds of contest, but the fact that they were similar to the original grounds does not signify they were not additional, nor warrant a reliance upon them after the time for filing a contest petition has passed. Subsection 12, section 1596a of the Kentucky Statutes with reference to election contests requires that the petition "shall state the grounds of contest relied on, and no other grounds shall afterwards be relied on." See also Anderson v. Likens, 104 Ky., 699.

After it had been established that the ballot boxes and their contents had been safely preserved, the court had them opened, and the votes recounted. The recount showed that Robinson had a plurality over Clark of 74

votes. The court then counted in Clark's favor three questioned ballots which had been returned by the election officers uncounted. This reduced Robinson's plurality to 71 votes. It should be noted here that this result came from a recount and tabulation of the vote of every precinct in the county, including the Brickyard precinct number fifteen, but the court being so impressed with the irregularities shown in the conduct of the election in that precinct, adjudged that the election in that precinct was void, and should be disregarded, and held for naught. This served to still further, and very materially, increase Robinson's plurality. It should also be noted that this result is reached without taking into consideration any of the illegal votes or voters complained of. by either party.

It, therefore, appearing that Robinson was elected, the certificate theretofore awarded to Clark by the election commissioners was cancelled, and Robinson declared elected, and entitled to qualify as superintendent of common schools of Carter County.

Clark accepts without a word of complaint or criticism the fairness and accuracy of the recount, but insists that the court had no right to make a recount because the ballot boxes and contents had been taken, the day the petition was filed, from the custody of the county court clerk, which officer, as Clark claims, was the proper and only officer to keep them. A reference to section 1596a, subsection 12, Kentucky Statutes, shows that the court had the power to transfer the custody of the ballot boxes from the county court clerk to the master commissioner of the circuit court. This section, among other things, provides: "All ballots, poll books, stubs or other papers concerning which there is any ground for contest may be removed to the court in which the action is pending."

Clark insists that the court erred in holding there was no election in precinct number fifteen. In the sense that the result was not affected by counting or by rejecting the returns from this precinct, Clark's contention is correct, but for the same reason, he should not complain. From a sense of disgust at the flagrant disregard of nearly all the election laws by the officers, the court must have felt impelled to make this ruling. The testimony shows that the election was held there in a space about eight feet square, and that neither Robinson nor his party had a real representative among the officers, challengers, or inspectors from the time the polls were

opened until the vote was counted and certified. One of the judges was perhaps a loyal supporter of Robinson, but he was old, and physically unable to be of service to the Commonwealth, the voters, or any candidate in the way of securing a fair election. Ordinarily this alone would not be ground for disregarding an election in a precinct, for the political parties and candidates can usually be relied upon to select officers who will safeguard their interests, but the proof in this case makes it apparent that the situation with reference to the officers was studied and premeditated by certain of Clark's avowed friends. A vacancy was arranged, and a substitute agreed on ten days before the election and without reference to the County Election Commissioners. This old man was brought there on the morning of the election, hardly knowing why, to take the place of a regularly appointed officer who had refused to serve, for reasons that are suspicious.

All of the challengers and inspectors were supporters of Clark with perhaps one exception, and in view of the glaring fraud perpetrated under his supposed inspection, there is grave doubt as to him. In this eight foot square space there was a table and two goods boxes used as tables, and upon one of them the clerk prepared the ballots for the men to use, while upon another the sheriff prepared the ballots for use by the 118 women who voted in the school superintendent's race. The fact that the clerk did not write his name on the ballots prepared by the sheriff did not deter the other officers from depositing them in the box, notwithstanding the inhibition of section 1476 of the Statute. Two voting booths stood next to the side wall, and for some one's convenience a space about four inches square was cut through the wall just above the top of each, and for further convenience there was a platform on the outside of the room, and just under these holes. Just why these booths were so placed is not clear. There is no proof that any one used the platform on the outside to inspect the ballot as the voter marked it, or held it to the opening. Indeed in view of the conduct of the election by the officers, there is no reason why any one should go to this trouble, for not many of the men, and not more than eight of the women, went to the booths at all. The voters came into the room as they pleased, and as fast as space was found by them. The officers very accommodatingly inquired for whom they wished to vote, and on learning

this fact, the officers marked the ballot by stencil regardless of who was looking on. We take it for granted that the officers marked the ballots as the voters requested. There is no proof to the contrary, and nobody but the officers know, for in many cases the voters never saw or had hands upon the ballot. Where the officers did not mark the ballots, the voters, and especially the ladies, without going into the booth spread the ballot on the table in full view of all present, and marked it. In no case, where the officers marked the ballot, was the voter sworn as to his disability so to do; and in some instances, two at least, if the voter could not come within the polling place, or did not care to, some officer carried the ballot or ballot book outside to him. Of the 118 women voting in that precinct, not more than eight went into the booth, or attempted to mark, or cast a ballot secretly. The ballots for all the others were cast openly and on the table, and in no instance was an oath required of them in order to make that character of voting necessary or proper. It is proven that at least two of the officers and one of the challengers were electioneering for Clark a good part of the day, either in sending for voters or, as is related of one of them, "dictating voters." It is conceded that one of the challengers was too "officious." In Banks v. Sergeant, 104 Ky., 843, the court refers to a situation similar to the one in this precinct as follows:

"It was in no sense a secret ballot. The secrecy of the ballot is the fundamental idea of all elections, and this is required by the constitution as well as by statute. This central idea being disregarded in this precinct, and a practical *viva voce* election held, as the proof shows, we are of the opinion that the returns therefrom should be disregarded."

Notwithstanding all these irregularities and total disregard of the law as to secrecy of the ballot, it still might be claimed that the voters were nevertheless expressing their will and preference, but when the recount, as made by the court, is compared to the count as certified by the officers, the iniquity of the whole thing is made so clear as to cause the court to distrust their every other act, and to render uncertain everything certified by them, unless it is the fact that the vote, as they certified it, is nothing more than an expression of their will, instead of the voter's.

On the recount it was found that Clark only received 292 votes instead of 365 as certified by the officers. Rob-

inson received 58 instead of 23 as certified by the officers, and Mrs. Shay received 54 votes instead of 20 as certified by the officers. It cannot go in justification nor mitigation of this situation to say that there was no other *public* building in this Olive Hill precinct in which to hold the election—this was not a public building—nor will it do to say that election had been held there before—the platform on the outside, the holes in the wall, and the limited space within is abundant reason why an election should have never been held there again; nor will it do to say that the old man, above referred to, had served as election officer before, for perhaps his decrepit condition was the reason for his service then as now.

Clark insists that if this precinct is disregarded, then the election in every other precinct should be disregarded. In other words, that it be declared that there was no election in the county. There was evidence that some illegal votes were cast at most all the other precincts in the county, and that the ballots of some legal voters were cast in an illegal manner, but the identity of these voters, and the person for whom they voted is sufficiently well established, so that if they, or any of them, affected the result, they could be eliminated. There is no evidence of fraud or crime on the part of the officers elsewhere, and the irregularities are such as ordinarily come from honest mistakes.

As above indicated, the recount of the ballots in open court settles this contest, and the result is not affected by either considering or disregarding the vote in precinct number fifteen, nor is it affected by a consideration of the illegal and irregular votes cast in other precincts. About an equal number were complained of by each side, and giving to Clark the most favorable view of the proof, the irregular and illegal votes were substantiated by each side in about equal proportions.

Another error of the court which Clark complains of we will consider, although in view of what has been said above about the recount by the court, it is hardly necessary; anyhow, Clark complains that in the original petition setting forth in detail the names of voters who had been permitted to vote openly, or as it is commonly referred to, upon the table, the contestant failed to allege that this manner of voting was allowed by the officers without requiring the voter to swear that he was physically disabled. As illustrating this form of pleading, we quote from his allegation as to precinct three, where

after naming the voters it is said they "exposed their ballots at the time of voting in the view of other persons and did not vote by secret ballot at all, but out in the open in full view of other persons without any secrecy at all, contrary to law, and each of them voted for L. P. Clark, and their votes were so counted."

This form of pleading applies to all the precincts, except number four and fifteen, where most of this kind of voting is alleged to have occurred, and as to these two precincts the allegation is made that the voters did not take the oath. When the case was submitted, and they were proceeding to trial, Clark moved the court to strike from the petition all allegations of this form of voting except as to precincts four and fifteen, because it did not appear that the voters had not been sworn, and therefore on the face of the pleading there was nothing improper in that manner of voting. The court indicated an intention of sustaining the motion, when appellant offered, and the court permitted him, to file an amendment to perfect the pleading, and which is as follows:

"Now comes the plaintiff, and by leave of court, amends his original petition herein for the purpose of making the allegations thereof more definite and specific and certain, and to conform to the proof, in accordance to the ruling of the court herein; and for such amendment states that each and every name set out and alleged in said original and amended petition of persons who are charged in said petition and amended petition as having voted openly at the election in controversy, and whose votes were cast and counted for the defendant, L. P. Clark, as set out in said petition and amended petition, are each and all made a part of this amendment, and that each and all of said persons and voters who so voted, as set out in said petition and amended petition, did so vote openly without first declaring on oath that by reason of inability to read the English language, he or she was unable to mark his or her ballot, or that any of them were blind or physically disabled, so as to be unable to mark his or her ballot, or that any of them made any oath as to any of these disabilities or disqualifications at all, and they did not qualify themselves to vote openly, nor did any of them qualify themselves to vote openly by making oath before the election officers, or declaring on oath, or at all, before said election officers that any of them were by reason of inability to read the English language, unable to mark his or her ballot, or were so

physically disabled as to be unable to do so, or were blind.''

Clark objects to this, claiming that the amendment set forth additional grounds of contest. It will be noticed that this amendment does not bring in the names of any other voters, or make any charge of additional irregularities. It merely undertakes to do what it purports, that is, to perfect and make more definite and specific the grounds set up in the original petition. The ruling of the court in permitting the amendment to be filed is supported by the case of Wilson v. Hines, 99 Ky., 221, where in considering this question, we said:

''Under this statute a contestant is not allowed to set up, by way of amendment, an entirely new ground of contest, in addition to those stated in his notice, but he is not thereby precluded from amending and making more specific and definite any ground that is embraced in the notice. This may be allowed, and in fact it may be required to be done under the Civil Code (section 134), which applies to proceedings of this kind as well as to regular actions, and under which it was proper for the board and the lower court to permit the contestants to amend, as was done, in such a manner as to make definite the charge that the act under which the election was held was not in force and the reasons for it. That did not in this case make a new or additional ground of contest, but simply made more definite and certain one of the grounds of contest stated in the notice.''

To the same effect is the case of Adams v. Roberts, 119 Ky., 364.

We are of opinion that the judgment of the lower court is correct, and it is, therefore, affirmed.