### Hatcher v. Petry.

(Decided Oct. 25, 1935.)

BOND & BOND for Hatcher.

HILL & HOBSON for Petry.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming in part and reversing in part.

On the face of the returns, J. J. Hatcher had a majority of 10 over Mel Petry for the Democratic nomination for representative of Floyd county. Petry contested the election. On a recount, certain ballots were held to have been improperly counted because of the failure of the election clerks to sign them as provided by law. The result was that Hatcher's majority was raised to 137. The judgment was affirmed in Petry v. Hatcher, 260 Ky. 426, 86 S. W. (2d) 142, decided September 24, 1935. The trial of the contest involving other grounds and defenses proceeded, as authorized by chapter 62, Acts of 1934 (section 1550-28, Statutes, 1934 Supplement). It was adjudged that the entire vote in John Possum precinct (where Hatcher received 81 and Petry 23 votes) and Jack's Creek precinct (where Hatcher received 375 and Petry one vote) should be disregarded because of the flagrant violations of the law and corruption of the ballots. The result was to hold that Petry had a majority of 295. It was further adjudged that neither Petry nor Hatcher had been proven guilty of violating the Corrupt Practice Act (Ky. Stats. sec. 1565b-1 et seq.), and, accordingly, that Petry was the nominee. Hatcher appeals and Petry moves for a cross-appeal from so much of the judgment

as holds Hatcher to be innocent and that he should bear the cost of the depositions taken in his behalf.

The appellant, Hatcher, does not raise any question as to the elimination of the John Possum precinct because he says its restoration would not affect the result. The evidence, however, shows the precinct vote to have been properly rejected as corrupt.

The evidence attacking the election in the Jack's Creek precinct overwhelmingly shows a condition bordering on anarchy. The county clerk delivered the box for that and another precinct with the ballots and paraphernalia to Frank Hatfield on the afternoon before the election. He was a deputy sheriff and designated clerk of the election in that precinct but did not serve in that capacity. On that night Hatfield and Dr. W. L. Stumbo brought three ballot boxes to the "Rocky Creek" tourist camp of M. M. Moore, which, it seems, is in Pike county. Stumbo told Moore the boxes were for the Jack's Creek, Burton and Melvin precincts and that they were going to give Petry (Moore's brother-in-law) all the votes and Ballard James, a candidate for state senator, one-half of them. However, Stumbo was opposed to Petry and had previously sought to have a labor union official get him out of the race, telling him there was $2,500 in it if he would, to be split two or three ways. Joe Fannin had preceded these men and rented a cabin for the night, but he surrendered it to Dr. Stumbo and Hatfield upon being told that his favorite candidate for Governor would receive all of the ballots. He testified that the shades of the cabin were drawn and that Hatfield was inside with the open boxes, ballots, stencils, and pads, while Dr. Stumbo was in an automobile nearby. Mr. James testified that he arrived at the camp about 11 o'clock on the trail of Dr. Stumbo and his opponent, who, it seems, had Stumbo's support. The cabin blinds were drawn, and he knew nothing about what was going on inside, but in a previous conversation Hatfield had promised to give him half of the votes in the Jack's Creek precinct. Dr. Stumbo is silent in all the known languages. Hatfield denies he was there that night, and testified he received the boxes and the ballots from the county clerk and kept them without anybody having access to them until he delivered them to the polls the morning of the election. Fannin's reputation is both attacked and supported.

In this precinct, as we have stated, Hatcher was

given 375 votes and Petry one vote. This lone ballot bears evidence of having been stenciled for Hatcher and erased. Eight witnesses testify that they were given ballots already stamped for Hatcher. There were no voting booths, and the ballots were stamped on school desks. When a voter asked for the stencil, he was told to look around and find it, whereupon Frank Hatfield appeared with the stencil and, over the voter's protest, stamped the ballot to suit himself, where it was not already stamped. When H. B. Hall, postmaster at Bevinsville, and meter operator for the Warfield Natural Gas Company, arrived shortly before 3 o'clock to vote, he was told that the ballots had run out and the polls were closed. When he asked to see the stub book, one of the officers informed him that it was up at Frank Hatfield's. This witness, who had lived in the precinct eight years and whose duties enabled him to know every one in it, testified that he did not know 164 persons whose names appeared on the stub book; and although 407 ballots were cast, he thought there were only 150 legal voters in the precinct. Other witnesses substantiate this evidence. Some whose names appeared on the stubs testified they lived elsewhere and had not voted in this precinct. Significant repetition of given and surnames and the unusual character of some of them cannot be mere coincidences. Among those recorded are "New River," "John Doe" and "Mrs. John Doe." We thought the ubiquitous Mr. Doe was pretty well known, but some of the witnesses never heard of him. Others had heard of him as having given a number of "cold checks" and signed liquor applications, but say he does not live in the precinct, unless he is one of the Hungarians living in the mining camp. By contrast, it is shown that in the succeeding runoff primary, the maximum vote was only 91. There is other evidence, but this is quite enough. There is some countervailing evidence as to the number of legal voters in the precinct and the identification of some of the voters, also that witnesses were given unvoted ballots. Frank Hatfield denies everything. While the election officers (one of whom had been convicted of a felony) testified in effect that the election was as orderly and pure as a cathedral service, it was hardly so, judged by the documentary evidence and more persuasive testimony. It was a criminal farce. The court could not have done otherwise than to throw out the precinct.

Whether the appellee violated the Corrupt Practice Act is a twofold question.

It is argued that there was a violation of section 1565b-1 of the Statutes relating to contributions to campaign expenses of candidates, the provisions of section 1565b-11 making a candidate responsible to the extent that he must forfeit his right to the nomination or election if such contributions are made in his behalf with his knowledge. The first part of the section (1565b-1) makes unlawful such contributions by public service corporations. The second part makes it "unlawful for any corporation, person, company or association to contribute, either directly or indirectly, money, service or other thing of value, towards the nomination or election" of any officer if he "in his official capacity, is required by law to perform any duties, peculiar to such corporation, person, company or association not common to the general public, or if it is the duty of such officer to supervise, regulate or control in any way or manner the affairs of such corporation, company, person or association, or if such officer has any duty to perform in assessing the property of any such corporation, person, company or association for taxation." The third part of the section declares it to be unlawful "for any corporation not falling within the above mentioned classes" to make such contributions as therein specifically set out.

The appellee, Petry, is the president of Local Union No. 5900 of the United Mine Workers of America, and O. K. Wallace is the recording secretary. That lodge voted a contribution of $50 to be expended in Petry's behalf. This was with his knowledge and consent. The money was paid to and expended by Wallace. According to the postelection expense account, it was spent for cards and traveling expenses.

Of course, it is conceded that the first part of section 1565b-1 is not applicable. The appellant argues that the proper construction of the second part must be that it means that no candidate who holds an office in a corporation or association and performs the duties therein not common to the general public shall knowingly receive or accept financial contributions or promises from that corporation or association. This, he says, is because it would be against the public welfare, since it would result in a representation of a special interest

in public office. We cannot concur in such a construction of the statute. It is clear, we think, the reference to the performance of duties "in his official capacity" pertains to the duties of the public office which he is seeking. As to the third part of the section—prohibiting all corporations from making campaign contributions—it is sufficient to say that there is no evidence that the local lodge of the miners' union was a corporation.

The second phase of the charge of violation of the Corrupt Practice Act by and in behalf of the appellee is that he did not sustain the burden as contestant of proving his innocence. See Humbert v. Heyburn, 240 Ky. 405, 42 S. W. (2d) 538; Mounts v. Hatfield, 250 Ky. 727, 63 S. W. (2d) 928. The appellee testified unequivocally and categorically that he did not violate any of the terms of the law. W. K. McCoy testified that at a certain time and place Petry gave him $26 with which to buy votes, and which was so used. While there is some evidence tending to corroborate McCoy, the overwhelming and more satisfactory evidence refutes him. Evidence pertaining to an attempt to bribe Ed Gayheart is likewise. Another class of evidence in this connection is that O. K. Wallace was appellee's campaign manager and was guilty of buying votes in his behalf. While Wallace was very active for Petry and accompanied him part of the time during his campaign, they both deny that there was any relation of manager. Evidence as to Wallace having given $20 to Flem Stanley and $25 to Gus Johnson to be used in the purchase of votes is contradictory. The reputations of the witnesses are vigorously attacked and sustained. But there is no evidence showing knowledge on the part of Petry such as would impute Wallace's guilt to him. Certainly, the contradictions are such that we are not willing to set aside the judgment of the trial court in the matter.

It follows that on the direct appeal, the judgment should be and it is affirmed.

On the cross-appeal it is not necessary to consider the charge that the appellant, Hatcher, violated the Corrupt Practice Act. However, as a matter of fairness, we may say that the evidence does not show his guilty knowledge of some bribery in his behalf.

The court adjudged the contestant his costs except

the expense of taking his depositions. We think this was error. Section 889 of the Statutes provides that the party succeeding in an ordinary or equity action on the merits of a case shall recover his costs. While an election contest is a special action and the procedure laid down for contests in primary elections does not specifically provide for the taxation of costs, it is provided in section 1596a-12 (1933 Supplement), pertaining to contests of regular elections, that "The unsuccessful party shall pay all costs in both courts." No good reason is apparent why the same rule should not obtain in primary election contests. On the cross-appeal, the judgment is reversed to the extent that it adjudges the appellee to pay any part of the costs.

The whole court sitting.