## Campbell et al. v. Combs.
## Same v. Singleton.
## Same v. Risner.

(Decided May 3, 1938.)

T. E. MOORE and C. L. TIGNOR for appellants.

J. C. BURNETTE and COMBS & COMBS for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

Three members of the Knott County Board of Education were to be voted for at the November, 1937, election. The returns of the candidates and votes were certified as follows: T. C. Campbell, 2,077; Cleve Combs, 1,973; W. J. Amburgey, 1,923; Silas Combs, 1,856; C. C. Singleton, 1,745; Hagan Risner, 1,612. Certificates of election were issued to the first three named, and each of the last three filed a contest against them. They responded with a counter contest. The cases were consolidated after completion of the issues. The circuit court held there was no election because of fraud and corruption. Campbell and Combs, contestees, have appealed.

On April 6th, the contestants filed a motion in this court for a cross-appeal. The appellants objecting, the motion was passed until this time. The judgment having been rendered February 22d, the appellants maintain that there is no authority to grant the cross appeal since section 1596a-12, Statutes, provides as a condition to giving this court jurisdiction that an appeal of an election contest must be taken within thirty days after judgment. The movants rely upon Green v. Ball, 216 Ky. 563, 288 S. W. 309, which holds that a cross-appeal in an election contest is governed by the Code of Practice, and may be filed beyond the thirty-day limit. Without considering the soundness of that opinion, we must deny the cross-appeal because the movants have not executed a supersedeas bond, which section 1596a-12, Statutes, also provides shall be done as a condition of appeal and jurisdiction in an election contest. Galloway v. Bradburn, 119 Ky. 49, 82 S. W. 1013, 26 Ky. Law Rep. 977; Felts v. Edwards, 181 Ky. 287, 204 S. W. 145; McKinster v. Shaffer, 186 Ky. 582, 217 S. W. 676; Whitt v. Reed, 235 Ky. 758, 32 S. W. (2d) 324; Barker

v. Blankenship, 271 Ky. 213, 111 S. W. (2d) 592. The motion for a cross-appeal is, therefore, overruled.

The appellants are insisting that Judge J. F. Bailey, who was designated as a special judge to try the case, should have vacated the bench. Appellants filed a motion to that end, supported by an affidavit stating that Judge Bailey had been also designated to try two injunction proceedings growing out of the election and claimed vacancies in the offices of the board of education and involving all of these parties; that the appellants had requested and later filed motions that Judge Bailey should not further delay his decisions in those cases, which were overruled; and then they had filed proceedings in this court charging him with arbitrarily refusing to pass upon the motions pending before him, and seeking to have us mandatorily require him to act. It was charged in the affidavit that the allegations of the petitions in this court were such that Judge Bailey would be prejudiced and biased against the contestees so that he could not and would not give them a fair trial of the contest case; and that his conduct before filing the motion to vacate showed he was already biased and prejudiced against them and partial to the contestants, which attitude was aggravated by the institution of the proceedings in the Court of Appeals.

If an authorized proceeding, respectfully taken, in a case to have the judge act upon motions should be deemed to create conclusively an implied bias, it would afford a very ready method of disqualifying a judge when a litigant merely desired, without legal cause, to get rid of him. We are quite sure that no man possessing the character and qualification of a circuit judge would consider such steps as were taken in this case as so personally offensive that he would let it affect his official behavior. It is to be observed that the suspicions of possible antagonism were without foundation, for after those proceedings were had Judge Bailey decided the injunction cases in favor of the appellants in this case. The motion to vacate the bench was properly overruled as the reasons offered in support were not sufficient.

In Upper Beaver precinct No. 14, in which there were 353 registered voters, no election of any kind was held. All the ballots were stolen. Both sides in this case vigorously deny responsibility for this. The only

evidence concerning the crime is that of Garrod Thornsberry, who had been appointed an election officer in this precinct. He testified that C. B. Bates, a present member of the board of education and an active supporter of the contestants, on Tuesday before the election said to him:

> "If I would let him steal the election he would give me the biggest place I ever had; said he was more interested in the school commissioners race than any other race."

But there were some grounds for ill feeling on the part of Thornsberry toward Bates. Bates gave an affidavit in support of an objection to the granting of time for the contestees to take Thornsberry's deposition, in which he denied having made such a statement. But he did not as a witness contradict Thornsberry's testimony.

In Lower Beaver precinct No. 13, there were 225 ballots used in the school board election. Hillard Hall, called by the contestants as a witness, testified: "I had resolved before the election that I was going to do everything I could to defeat Beckham Combs' men," and did everything in his power to carry out that resolution. Beckham Combs was the county school superintendent and the contestants were his "men." Hall made it convenient to show up before the polls opened and was appointed clerk of the election in place of the man theretofore named by the election commissioners. There were submitted to him the names of 64 voters, 62 of whom he admitted having voted across the table without having them sworn as incapable of voting secretly as required by section 1475 of the Statutes. He voted every one of them for the contestees. He electioneered for them in the room where the election was being held. He put marks in the square of the ballot given some of the voters and asked them "not to forget those men." In addition to voting the ballots openly and across the table, Hall stated:

> "I would vote their ballot in the square in front of their name and reach it to them when they went to the booth to vote. There was some few didn't desire to vote in that race at all, and every chance that I would get I would slip their ballot in my left hand coat pocket and at noon hour when they were all out except me and John C. Slone I marked

those ballots and deposited them in the ballot box.''

Hall testified that he voted somewhere between 15 and 20 ballots in this manner. However, when a list of 72 names was read to him he admitted having marked the ballots or voted all but 6 or 7 of those persons. These he had voted across the table.

All the election officers testified that none of those voting across the table were sworn as to their illiteracy or disability.

Cam Bates, a challenger, also interested in the success of the contestees, testified to remembering only 35 persons who were voted across the table by Hall. But part of the time he was out of the polls. Hall electioneered throughout the day and the witness saw him tear out school ballots and put them in his pocket when voters told him they were not interested in the school race. He named some of them. When the witness and others went to dinner, Hall stated that he remained and voted the ballots he had in his pocket.

Albert Cook, Hall's half-brother, was one of the judges of the election. He testified that Hall electioneered with 12 or 15 voters, but he saw him mark only one ballot. This was in the afternoon and he ordered Hall to stop that. John Slone, sheriff of the election, never saw or heard anything. Perhaps it was this blindness and deafness that prevented him from contradicting Hall that they voted the stolen ballots while others were gone to dinner. Israel Amburgey, who assisted in the count of the ballots, testified that some of those cast in this precinct in the school race had been marked with dots and crosses opposite the names of the contestees. Hillard Hall's reputation was proved by witnesses to be bad.

In their counter contests each of the appellants alleged that in Upper Caney precinct No. 18, the election officers had fraudulently permitted ''more than 75 voters to vote openly upon the table'' for the contestants without having been sworn as required by law. The same allegations were made as to ''more than 50 voters'' in Upper Quicksand precinct No. 9. The several replies followed the language of the counterclaims and denied, in one instance, that ''more than 75 voters'' were permitted to vote openly, and in the other, ''more than 50 voters.'' The appellants now insist that these

traverses constituted admissions that 75 and 50 illegal votes were cast for contestants. Near the end of the trial the court permitted the contestants to amend their reply and to deny that there were any such illegal votes cast for themselves. It is insisted that this ruling of the court was erroneous as the period of limitations for pleading had long before expired. In Roby v. Croan, 177 Ky. 9, 197 S. W. 456, a similar negative pregnant pleading appeared, and the court permitted its correction through amendment. Appellants would distinguish that case by the fact that a demurrer had been interposed to the pleading and sustained and then time was given to amend, while in these cases there were no demurrers or motions to make the denials more definite or specific. They insist that they have the right to rely upon this defect. The rule of practice whereby the court may at any time permit amendment of pleadings in the furtherance of justice, section 134, Civil Code of Practice, is applicable in election cases unless some new cause of action or additional ground of contest is set up after the period of limitations. We think the ruling was proper. Clark v. Robinson, 159 Ky. 25, 166 S. W. 801; Burke v. Greer, 197 Ky. 555, 247 S. W. 715; Herald v. Turner, 237 Ky. 827, 36 S. W. (2d) 623.

The appellants vigorously denounce Hillard Hall as unworthy of belief. The appellees claim priority of disgust, but insist that his testimony is not contradicted and is strongly corroborated. Hall's deposition reflects that he was at least not an unwilling witness for the contestants. Ordinarily, a man of this character evades the truth in order to protect himself and preserve his friends. This man's testimony condemns himself and ruins his friends. Though perhaps some allowance should be made for a bragging attitude, the circumstances indicate that he was in the main telling the truth. Such are the returns from the precinct—ten to one in favor of each of the contestees. The only sort of contradiction is as to the number and extent of the crimes committed by this man. There is no intimation as to why he should have turned upon those whom he had so advantageously, though corruptly, served. Nor is there any explanation why he should have sworn to the commission of so many felonies. It may have been to avoid perjuring himself, deeming such offense more heinous than stealing an election, or, possibly more dangerous. The appellants contend that this precinct

should not have been thrown out but that the illegal votes, which they place at 35, should have been purged. That would leave each of them a majority. But we concur in the conclusion that the returns must be disregarded because there was such a large proportion of illegal ballots cast it is impossible to determine just how many there were to be charged up against the contestees. Hatcher v. Petry, 261 Ky. 52, 53, 86 S. W. (2d) 1043.

This conclusion and that reached as to precincts Nos. 9 and 18, above stated, destroy the basis for appellants.' calculation which, if accepted, would place them in office. Their calculation is to take from their totals 35 illegal votes in Lower Beaver precinct No. 13, and to take from the contestants 125 votes which they claim were admitted by the pleadings to have been illegally cast. This would leave appellants such a majority that the entire registered vote of 353 in precinct number 14, where there was no election, could be given to the contestants and yet contestees would be elected.

Eliminating precincts Nos. 13 and 14, which together may possibly have cast over 578 votes, the conclusion is inevitable that the case comes within the provision of section 1596a-12 of the Statutes, which places upon the courts the duty of declaring that there has been no election where it appears from the whole record that there has been such fraud or violence in its conduct that neither party can be adjudged to have been fairly elected. Harrison v. Stroud, 129 Ky. 193, 110 S. W. 828, 33 Ky. Law Rep. 653, 16 Ann. Cas. 1050; Scott v. Roberts, 255 Ky. 34, 72 S. W. (2d) 728.

It is presumed that the circuit judge, as a conservator of the peace in his district, and the commonwealth's attorney, as the chief prosecuting officer, have directed the attention of the grand jury of Knott county to the confession and proof of crime contained in this record.

The judgment is affirmed.