## McClendon et al. v. Hamilton.

## Acton v. Jasper et al.

Feb. 21, 1939.

As Modified on Denial of Rehearing May 2, 1939.

J. S. Sandusky, Judge.

CHAS. N. HOBSON, BEN V. SMITH & SON and B. J. BE-
THURUM for appellants.

E. T. WESLEY & SON and R. C. TARTAR for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Reversing.

The ineligibility of three men elected in November,
1937, as members of the Board of Education of Pulaski
County, has brought about confusion, unfortunate to the
interest of the public and inimical to the welfare of the
schools. Three different groups have been claiming the
right of succession. The attempts to exercise and the
exercise of the duties of the offices in connection with
one or the other, or independent of either or both, of two
holdover members, would have resulted in chaos but
for the control and restriction of a series of injunctions,
several of which reached members of this court. The
points upon which these cases involving the right to
those offices and that of county superintendent are de-
cided make it unnecessary to recite much of the story,
or refer to all the various arguments and contentions
made on this appeal.

In accordance with the terms of Section 480 et seq.
of the Civil Code of Practice, the Attorney General
prosecuted actions against Whittaker, Wilson and Nor-
fleet as usurpers of the offices because of their disquali-
fication. The circuit court entered judgments on Janu-

ary 29, 1938, ousting Whittaker and Wilson. They superseded the judgment and, except as restricted by an injunction pending appeal, proceeded to perform the duties of those offices. The appeals were decided and those judgments affirmed on March 25, 1938. Whittaker v. Commonwealth ex rel. Attorney General, 272 Ky. 794, 115 S. W. (2d) 355. The trial court adjudged Norfleet to be eligible and decided the case in his favor. We held him to be disqualified and reversed the judgment with directions to enter another declaring his office vacant. Commonwealth ex rel. Attorney General v. Norfleet, 272 Ky. 800, 115 S. W. (2d) 353. The mandates in all the cases were filed in the circuit court clerk's office on May 4, 1938, and an order was made filing them and entering appropriate judgments on May 17th. However, Norfleet moved the court on May 19th to vacate the judgments because of the absence of notice and failure to file the mandate ten days before the commencement of the term. Section 761, Civil Code of Practice. That motion was sustained on May 21st and the entire new judgment was set aside. No judgment was ever entered declaring the office held by Norfleet to be vacant. However, it appears after one other attempt to function, which will be presently noted, he withdrew and took no part in the ensuing battles.

Section 4399-30, Kentucky Statutes, is as follows:

"Any vacancy in any board of education, from whatever cause occurring, shall be filled for the unexpired term by the other members of the board within 90 days after such vacancy occurs, and in case the vacancy is not filled by the other members of the board within said 90-day period, it shall be filled by the State Board of Education within 30 days after information has been filed by any citizen of the district that such vacancy has existed for more than 90 days. The member so chosen shall hold office for the unexpired term and until his successor is elected and qualified."

On May 4th Claude Jasper, one of the holdover members, and chairman of the board, made an affidavit reciting that there were three vacancies on the board since the determination of the ouster suits, and advising that he and James Hamilton, the other holdover member, had been unable to agree on anyone to fill the vacancies, and reported that it would be useless to make further attempt to do so. He, therefore, requested the

State Board of Education to give the Pulaski County Board of Education "such advice and assistance as may be necessary under the circumstances." This document was filed with the State Board, and on May 23d it elected Mrs. Maude Cundiff, Bluford McClendon and C. F. Vanhook to fill the vacancies.

Meanwhile, Hamilton and Norfleet undertook to name Bullock and Vaught to fill the places of Whittaker and Wilson.

It appears that Jasper at this time was recognizing the three persons named by the State Board as having been properly chosen. However, late in the night of August 15th, Hamilton went to Jasper's home, some distance in the country, and there made an unconditional surrender. He agreed that Jasper should name his relatives, Blaine Eastham, W. R. Perkins and Mrs. Florence Weddle to fill the three vacancies. This was done upon the idea that the judgments in the ouster suits had not become final until May 17th or later; hence that the selection by the State Board of Education of the three persons named was premature. This group, in turn, replaced James M. Holt, who seems to have been the storm-center, with Virgil K. Tartar, another of Jasper's kinsmen, then living in Mason County. If May 17th and August 15th both be counted, there were ninety-one days, and it could not be said that the vacancies were filled by Jasper and Hamilton as the remaining members of the board "within ninety days after such vacancy occurs," as prescribed by Section 4399-30 of the Statutes. To avoid this these parties maintain that there is ambiguity in the statute by reason of the provision that if a vacancy "has existed for more than 90 days" the State Board may fill it, and therefore the first day—May 17th—should not be counted, and they had the right to agree and fill the vacancies on August 15th.

These two conflicting elections brought about the lawsuits now before us. The two sets of appointees, the two holdover members of the County Board, J. M. Holt, former superintendent but now attendance officer, and Corbin Acton, superintendent, under the election of three members named by the State Board of Education, and Jasper, are the parties hereto.

As indicated, the issue is as to which of the two groups constitute the legal members of the County

Board of Education, whether those named by the State Board or those named by the two holdover members. The decision turns upon the question of when the vacancies are to be deemed to have occurred.

Unless there is a statutory provision to the contrary, a judgment in a quo warranto proceeding declaring one holding a public office to be a usurper is self-operative and immediately divests him of all authority. Though such a judgment may be reversed upon appeal if found erroneous, yet under generally accepted law the judgment is not suspended by the appeal. The effect of a supersedeas is only to stay the issuance of an execution for costs. High on Extraordinary Remedies, Sec. 756, p. 701; Mechem on Public Offices, Sec. 497; 22 R. C. L. 719, 728; 3 Am. Juris. Appeal and Error, Sec. 565; 51 C. J. 363; Fawcett v. Superior Court, 15 Wash. 342, 46 P. 389, 55 Am. St. Rep. 894; People v. Reinberg, 263 Ill. 536, 105 N. E. 715, L. R. A. 1915E, 401; Ann. Cas. 1915C, 343; State ex rel. Guthrie v. Chapman, 187 Wash. 327, 60 P. (2d) 245, 106 A. L. R. 640; State ex rel. Sathre v. Roberts, 67 N. D. 92, 269 N. W. 913, 108 A. L. R. 37.

That this rule of non-suspension of a judgment of ouster pending appeal clearly applies where the proceeding is under the common law is not questioned. The only question is whether it applies in the substituted proceeding established by Sections 480 and 483, Civil Code of Practice. The former section reads:

"In lieu of the writs of scire facias and quo warranto, or of an information in the nature of a quo warranto, ordinary actions may be brought to vacate or repeal charters, and to prevent the usurpation of an office or franchise."

Section 486 defines a usurper, and Section 487 provides:

"A person adjudged to have usurped an office or franchise shall be deprived thereof by the judgment of the court, and the person adjudged entitled thereto shall be placed in possession thereof; but no one shall be adjudged entitled thereto, unless the action be instituted by him. And the court shall have power to enforce its judgment by causing the books and papers, and all other things pertaining to the office or franchise, to be surrendered by the usurper; and by preventing him from further exercising

or using the same; and may enforce its orders by fine and imprisonment until obeyed.''

Its interest and the contrast afforded seem to justify the following extended quotation from 22 R. C. L. 656, of the history and development of the procedure and the remedy by which one not entitled to a public office may be ousted:

''The ancient writ of quo warranto was in the nature of a writ of right for the king against one who claimed or usurped any office, franchise or liberty, to inquire by what authority he asserted a right thereto in order that it might be determined. As otherwise expressed it is a writ which the state may issue at will and of right. It is a demand made by the state upon some individual, to show by what right he exercises some franchise appertaining to the state, which, according to the constitution and laws of the land, he cannot legally exercise, except by virtue of some grant of authority from the state. The writ of quo warranto was a common law process of such antiquity that the precise date of its appearance is unknown. It appears, however, that it was an original writ issuing out of chancery, and a judgment thereon, as in the case of other prerogative writs, was conclusive even as against the crown. It has long since become obsolete in England due to the finality of the judgment and the complicated and cumbersome nature of the proceeding, and there has been substituted therefor the more modern method of determining the right involved by an information in the nature of quo warranto, which was properly a criminal prosecution instituted not only to fine the usurper, but to oust him from an office, franchise or liberty. While differing in origin, form and procedure from the writ of quo warranto, the common law remedy by information, like the ancient writ, was employed to try the right to an office or franchise. Whatever may have been the origin and history of the writ of quo warranto, and of its succeeding remedy by information, it is certain that the latter was a part of that vast mass of remedies for wrongs which was brought over to this country by the early English settlers.''

Since in its evolution the process had become criminal and a penalty other than removal was applied to a

usurper, it is apparent that the purpose of the statute, as embodied in the Code of Practice, was to avoid that result as well as to get rid of the cumbersome method of the common law practice by affording relief through the form of a simple ordinary action. Indeed, in 1830— before the adoption of the Code of Practice—it was pointed out that a decision on a writ of quo warranto against an incumbent did not restore the office to another claimant. He must have secured the office by mandamus, directed to the court, and the incumbent was not a party to that proceeding. "For these reasons," said the court, "as well as because the quo warranto and mandamus have become almost obsolete by disuse, although they are legal remedies in such a case as this, the action on the case is the most usual, the most appropriate, the most effectual remedy." Taylor v. Commonwealth, 26 Ky. 401, 3 J. J. Marsh. 401. In another case decided in 1846, when the common law rules of practice prevailed, the nature and purpose of the writ was thus stated in Commonwealth v. Lexington & Harrodsburg Turnpike Road Company, 45 Ky. 397, 6 B. Mon. 397:

> "The object of the writ of quo warranto, in such a case, is to vindicate the public authority, which has been contemned, and to resume the usurped franchise, by an ouster of the usurper. The remedy, therefore, is a public remedy, to be used in a case like this for public purposes, and which, although it may be founded upon the affidavit of individuals, on which the Attorney for the Commonwealth may act, cannot be wielded by any individual, who may choose to appear as the champion of the public interest but can be properly commenced in Court, only upon the motion and information of the person, appointed to represent the Commonwealth."

The courts generally have construed remedial statutes such as ours so as to promote and render them as effective as the common law writs, 22 R. C. L. 660. An important interpretation of our Code method has from the beginning been that in an action brought in the name of the Commonwealth for usurpation of an office, the burden is on the defendant to show by what authority he holds the office, though it is otherwise where the suit is by one who sues to recover the office for himself. Tillman v. Otter, 93 Ky. 600, 20 S. W. 1036, 29 L. R. A. 110; Stack v. Com., 118 Ky. 481, 81 S. W. 917; Dorain

v. Walters, 132 Ky. 54, 116 S. W. 313; Hermann v. Lampe, 175 Ky. 109, 194 S. W. 122. This rule is contrary to the procedure laid down by Sections 525 and 526, Civil Code of Practice, for cases of a different character. The reason, as given in the Stack case, is public policy. And though denominated as an "ordinary action," the peculiar nature of the proceeding has been recognized by contemporary practice, for all cases have been determined by the judge alone, and, so far as we are aware, no one has even claimed the right to a jury trial.

The accomplishment of the object is most important; namely, the removal by the sovereign, that is, the State, of one assuming to act as a public officer. Though the end is attained by the simpler process, it must be the same. It should be remembered that a public office is not a private right. Construed in the light of judicial history, and the evident and recognized intent to preserve the legal force and effect of the proceeding, and because the interest of the public—the common weal—is so transcendent, we are of opinion that the provisions of Section 487 of the Code, as to the nature of the judgment to be entered, mean that it is to be classed as is the common law writ and becomes immediately effective.

It cannot be said that our Code provides for the suspension of such a judgment pending final determination on appeal. Appellees maintain that the Code provisions pertaining to appeals generally permit such a judgment to be superseded and thereby suspended. They rely upon Simonton v. State ex rel. Turman, 43 Fla. 351, 32 So. 809; and State ex rel. McGuirk v. Davisson, 196 Ind. 451, 148 N. E. 401. In the former case it was held that a quo warranto proceeding was embraced within the general authority of the Florida statute which provided that all proceedings for review by an appellate court should be by writ of error and that every writ of error should operate as a supersedeas if bond be executed and other conditions complied with. In the Indiana case a like conclusion was reached under a statute providing affirmatively that when an appeal was taken it operated as a stay of all proceedings on the judgment upon a bond being filed. Our Kentucky statute relating to the suspension of judgments is not like either the Florida or Indiana statutes. Section 747, Civil Code of Practice, is negative. Disregarding provisions relating to injunction judgments, it merely provides that an appeal shall not stay proceedings unless a supersedeas be

issued. Section 748 prohibits the issuance of a supersedeas until a prescribed bond shall be executed. It is not declared that any or every appeal automatically suspends the judgment when such bond is made as in Florida and Indiana. There is no designation of any character or class of judgments that may be superseded. The legislature deemed it necessary to provide expressly (Section 1596a-12, Kentucky Statutes) that the right of appeal in an election contest is conditioned upon the execution of a certain kind of supersedeas bond, and it has been held that an election contest, therefore, is not governed by the general provisions of the Civil Code of Practice. Campbell v. Combs, 273 Ky. 404, 116 S. W. (2d) 955. There are other special classes of cases in which express provisions have been made concerning the suspension of judgments or right of appeal conditioned upon the execution of supersedeas bonds. Excepting the classes of judgments specifically mentioned in other statutes, we are relegated to the common law practice to ascertain the kind of judgments referred to in Section 747, Civil Code of Practice. Obviously, it is sufficient here to say in this connection—as we have already pointed out—that in the absence of statutory authority to the contrary, a judgment in a quo warranto proceeding cannot be suspended pending final appeal.

Therefore, the offices held by Whittaker and Wilson became vacant on January 29, 1938, when the circuit court rendered judgments that they held office illegally, and that the State Board of Education manifestly had the right to fill them, and did so, by its appointments made on May 23, 1938.

There are complications in the case involving the office formerly held by Norfleet since no judgment was ever entered ousting him. The appellants maintain that the date of issuance of the mandate directing the circuit court to enter judgment declaring Norfleet's office vacant (April 30th), or the filing of the mandate in the clerk's office (May 4th), is controlling. Until the litigation began or became bitter, all parties seem to have regarded May 17th as the date of vacancy. It seems unnecessary to pass upon that issue specifically. As above stated, Norfleet with Hamilton alone, after notice to Jasper, undertook to name two others to fill vacancies left by Whittaker and Wilson. Hamilton and Norfleet were then under injunction against taking any action as or assuming to be members of the Board. The four

of them, a few days later, filed suit against Jasper and the three persons named by the State Board and their appointees, challenging their election and appointment. The circuit court dismissed that suit upon the ground that the plaintiffs had no authority to maintain it, but nevertheless held the appointments by the State Board invalid. After this, Norfleet withdrew and, as we gather from the record, never afterward claimed any right to the office. He is not a party to these suits. Nor did Bullock or Vaught ever undertake to perform the duties of the office. The action of Jasper and Hamilton on August 15th in undertaking to fill the vacancies was ineffective. Two of the three persons named by the State Board on May 23d were legal members in the places of Whittaker and Wilson who went out on January 29th and they had no notice of the meeting. Brown v. Turman, 264 Ky. 407, 94 S. W. (2d) 1010.

On September 16th the State Board of Education re-elected Mrs. Cundiff, McClendon and Vanhook. It is, therefore, certain that the office formerly held by Norfleet was then legally filled.

The circuit court adjudged that the three persons named by the State Board were not members of the County Board, and that the vacancies had been legally filled by Mrs. Weddle, Perkins and Eastham by the election of the two holdover members held on the night of August 15th. Injunctions appropriate to that judgment were accordingly issued. For the reasons given, we think that judgment is erroneous. The converse should have been adjudged.

On May 26th the appointees of the State Board qualified and met with Jasper in regular session and elected Corbin Acton as County Superintendent of Schools, and James M. Holt as Attendance Officer. They also chose the teachers for the ensuing school term. Hamilton had no notice of this meeting. He, as sole plaintiff, brought suit against the other four members, Acton and Holt, seeking to enjoin all of them, except Jasper, from acting and to have their elections respectively held invalid.

There is much argument concerning the effect of the failure to notify Hamilton of this meeting. See Brown v. Turman, supra. The justification for not giving notice is that Hamilton had suffered a default judgment to be rendered against him in one of Holt's suits and

744

he was by a permanent injunction restrained from exercising any of the duties of his office. He was still a member of the Board and should have been given notice. It was for him to determine whether or not he would or could participate.

After the State Board, on September 16th, had reappointed the three persons originally named, they requalified and at a special meeting held September 20th, at which Hamilton and Jasper neither was present, Acton and Holt were re-elected superintendent and attendance officer, respectively. The record shows that both the absentees had received notice of this meeting. The elections were valid and the judgment to the contrary is erroneous.

The entire judgment is reversed with directions to enter another declaring Mrs. Maude Cundiff, Bluford McClendon and C. F. Vanhook to be members of the County Board of Education of Pulaski County; Corbin Acton to be County Superintendent; and James M. Holt to be Attendance Officer.

Judgment reversed.